IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS TOOL WORKS INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05 CV 05002 |
| | ) | |
| CHESTER BROTHERS MACHINED | ) | Judge Guzman |
| PRODUCTS, INC., an Illinois corporation, | ) | |
| d/b/a Pneu-Fast | ) | Magistrate Judge Denlow |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR ATTORNEYS' FEES AND COSTS

NOW COMES Defendant, Chester Brothers Machined Products, Inc. ("Pneu-Fast"), by its attorneys, and respectfully moves this Court pursuant to § 1117(a) of the Lanham Act, 15 U.S.C. § 1117(a) for an order granting Pneu-Fast its attorneys fees and costs incurred in defending the lawsuit, and in support thereof states as follows:

## I.  Standard for Attorneys' Fees Under §1117(a)

The voluntary dismissal by a plaintiff of their Lanham Act action with prejudice renders the defendant the "prevailing" party within the meaning of Federal Rule 41(b). *Fed. R. Civ. P. 41(b)*. *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1076-77 (7th Cir. 1987). §1117(a) of the Lanham Act authorizes an award of attorneys' fees to the prevailing party "in exceptional cases." U.S.C. § 1117(a); *S Industries v. Centra 1000*, 249 F.3d 625, 627 (7th Cir. 2001).

An "exceptional case" exists when the plaintiff's action was "oppressive." Prior to the 7th Circuit's decision in *Door Systems, Inc. v. Pro-Line Door Systems, Inc.,* 126 F.3d 1028 (7th Cir. 1997), this typically involved a showing of bad faith, dilatory and vexatious tactics, and something akin to abuse of process. *Bretford Manufacturing. v. Smith System Manufacturing*, 389 F. Supp 983, 984 (N.D. Ill. 2005).

In *Door Systems, Inc.* the 7th Circuit ruled that bad faith is not the correct standard for determining whether to award attorneys' fees to the defendant in a Lanham Act case, holding "…a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value." *Id.* at 1031, 1032.  Accordingly, a case can be "exceptional" simply because it is lacking in merit, and a defendant can be awarded attorneys' fees "based  solely on the weakness of [the plaintiff's] claims." *S Industries v. Diamond Multimedia*, 17 F.Supp. 775, 777 (N.D. Ill. 1998); *Sears v. Menard*, 2003 U.S. Dist. LEXIS 22246 *12-13 (Ex. A).  See also, *Bretford Manufacturing* 389 F.Supp. at 984.  ITW's lawsuit was oppressive both because it was filed in bad faith, and because it was lacking in merit.

## II. ITW's Oppressive Actions Prior to the Lawsuit

ITW is a Fortune 200 company with $9.3 billion in revenues.  (March 13, 2003 Declaration of Tom Southall to the PTO, Ex. B.) Pneu-Fast, on the other hand, is a small regional company with less than 1/10[th] of 1% of ITW's sales.  (Pneu-Fast's Answer to ITW's Interrogatory No. 8, attached as Ex. G to ITW's Motion to Dismiss (hereafter, "Motion").)  ITW did not file this lawsuit because it believed Pneu-Fast was infringing on a legitimate trademark.  Rather, as is apparent from the initial "cease and desist" letter ITW's in-house counsel Lisa Soltis sent Pneu-Fast on March 2, 2004 claiming Pneu-Fast sold nail guns, ITW sued Pneu-Fast in an effort scare Pneu-Fast into abandoning (a) its ad describing the superiority of its nails over ITW's nails, (b) its "PRO-NAILS" trademark, and (c) its use of the color orange in all respects.  (Ex. C.)

On April 6, 2004 Pneu-Fast attorney Megan McClung responded by informing Ms. Soltis that **Pneu-Fast did not sell nail guns** and that the gun in the ad was a prototype.  (Ex. D.)  Ms. McClung also explained that Pneu-Fast had an enforceable trademark on the name "PRO-NAILS," and prior rights in the use of orange for its trade dress due to its continuous use of orange for its

2

packaging for over twenty-one years.  On June 30, 2004, ITW's outside attorneys responded to Ms. McClung's letter, requesting samples of Pneu-Fast's packaging. (Ex. E.)  On July 9, 2004, Pneu-Fast's attorney responded by providing verification of the fact that Pneu-Fast had continuously used orange for its packaging since May of 1982 in the form of letters from independent third parties. (Ex. F.)  On May 19, 2005, ITW's outside attorneys sent Ms. McClung another "cease and desist letter", which Pneu-Fast's attorneys responded to on July 20, 2005, by again pointing out Pneu-Fast's historical use of orange, explaining that orange could not be protected as a trademark due to its functionality, and explaining that ITW's competitors' use of orange made it impossible for ITW to have obtained secondary meaning with respect to that color.  (Ex. B of ITW's Motion.)

### III.  ITW's Oppressive Lawsuit

ITW's effort to oppress Pneu-Fast continued when on August 30, 2005, ITW sued Pneu-Fast for trademark infringement and false designation of origin under the Lanham Act and for violations under the Illinois Deceptive Trade Practices Act and Unfair Competition.  Although Ms. McClung had already informed ITW that Pneu-Fast did not sell nail guns and had provided them with proof of Pneu-Fast's prior use of the color orange, ITW alleged "**Pneu Fast markets a pneumatic powered nailer** that contains conspicuously placed orange coloration on the body of the tool" and that "**[l]ong after** ITW/Paslode had been advertising and selling its products under the color orange mark throughout the United States … **Pneu Fast … began utilizing the color orange** in interstate commerce in connection with pneumatic nailers."  (¶ 11 of original Complaint, Ex. G., emphasis added.)

#### A.  ITW's Knowledge That Pneu-Fast Did Not Sell a Nail Gun and its Failure to Investigate the Claim

Ms. Soltis of course knew that Pneu-Fast did not sell a nail gun, and ITW's outside counsel knew this as well because on June 30, 2004 they responded to Ms. McClung's April 6, 2004 letter.

(Ex. E.)     And even if they had "forgotten" what Ms. McClung wrote, ITW and their attorneys should have known their claim was false prior to filing the Complaint. Even a casual reading of the Pneu-Fast advertisement, which was the basis of their claim, indicates it is for Pneu-Fast's nails and not for a nail gun.[1] (Ex. A of ITW's Motion.)

Regardless of Ms. McClung's letter, as a huge corporation and leading manufacturer of nail guns throughout the world, ITW would have known Pneu-Fast was not a nail gun competitor. Mark Boutelle, General Manager of ITW's Paslode division, testified that they asked their sales force to be on the lookout for a Pneu-Fast nail gun in the marketplace but they never heard anything back. (pp.14-16 of Boutelle's 4/6/06 dep., Ex. H.)   Tom Southall, ITW's President for its Paslode division, testified (a) he was generally knowledgeable about competitors who make or sell nail guns, (b) it was important for Paslode to keep track of its competitors who sell nail and staple guns, (c) it would have been relatively easy to instruct Paslode's sales people to talk to distributors to determine if they were selling a Pneu-Fast gun, but (d) he did not know whether this was done. (pp. 25-26, 119 of Southall's 4/12/06 dep., Ex. I.)  Similarly, Bruce Jacobs, Paslode's National Marketing Manager, testified (a) he was knowledgeable about ITW's nail gun competitors through his involvement with the trade organization, customers and through trade publications, and (b) Paslode's teams of 75 salespeople and 12 to 13 marketing people keep abreast of competitors and would make headquarters aware of new competing products. (pp. 19-21 of Jacobs' 3/16/06 dep., Ex. J.)  And Lew Klein, responsible for Paslode's marketing communications and public reations, who first brought Pneu-Fast's ad to the attention of his superiors, testified that after seeing the ad he did not investigate whether Pneu-Fast made a nail gun and did not know if anyone else at ITW conducted such an investigation.  (p. 45 of Klein's 3/1/06 dep., Ex. K.)

---

[1] For example, immediately following the headlines the ad states: "At last nails that distributors can sell with confidence … nails that your customers can use with confidence."  Nowhere does the ad state that Pneu-Fast sells nail or staple guns.

ITW's pre-suit knowledge that Pneu-Fast did not sell a nail gun and ITW's outside counsel's knowledge of the same (or at best their failure to investigate the claim) violated Rule 11 of the Federal Rules of Civil Procedure. Pneu-Fast's attorneys notified ITW's attorneys of this by letter on December 14, 2005, warning that they would seek sanctions under Rule 11 and 28 U.S.C. §1927 if they would not dismiss their Complaint. (Ex. C of ITW's Motion.) On January 17, 2006, ITW filed an Amended Complaint, dropping its claim that Pneu-Fast sold nail guns. On July 27, 2006, the Court granted Pneu-Fast's Motion to Dismiss the Amended Complaint, and on August 8, 2006, ITW filed its Second Amended Complaint, which it now seeks to dismiss.

### B. ITW's Knowledge That It Did Not Have a Legitimate Trademark

ITW has always known its trademark is illegitimate because it was fraudulently procured. A federal trademark registration can be vitiated with proof of fraud. *Gaffrig Performance v. Livorsi Marine*, 2003 U.S. Dist. LEXIS 23018 *38 (N.D. Ill. 2003) (Ex. L). ITW applied for the trademark on May 16, 2002. (Ex. M.) On September 18, 2002 the Patent and Trademark Office ("PTO") issued an Office Action requesting that ITW "…advise of the use of the identified color by the relevant industry, if any competitors produce the same or similar goods in the identified color and in colors other than the identified color." (p. 5, Ex. N.) ITW responded by sending the PTO copies of marketing materials from competitors and stating "[t]hese materials demonstrate that competitors of Applicant do not make competitive products in the color orange, but rather chose to use other colors for their products …." (p. 5, Ex. N.)

ITW backed-up its response with Tom Southall's Declaration, in which he swore ITW "has been making substantially **exclusive** and continuous use of the color orange in connection with its pneumatic and gas powered hand tools, namely, nailers and staplers since at least as early as January 1, 1997." (¶¶ 2 & 9, Ex. B, emphasis added.) During his deposition, however, Mr. Southall testified he knew Spotnails had began using orange on its nailers and staplers in at least the 1970s, and

possibly as early as the late 1960s, and did so continuously until 2001 and 2002. (pp. 166-167 of Southall Dep. Ex. O, ¶ 6 of Waterman Affidavit, Ex. P.) Mr. Southall testified that when ITW submitted its trademark application he or other ITW people were aware of Spotnails. (p. 172 of Southall Dep. Ex. Q.)

Similarly, Mike Bird, Vice President of Pneu Tools, Inc., stated in his Affidavit that (a) the primary color of Pneu Tools nail guns and staple guns has always been orange, (b) Pneu Tools introduced its first staple gun at its booth at the Specialty Tools & Fasteners Distributors Association's ("STAFDA") trade show in November of 1999, (c) ITW representatives became aware of the gun when they viewed the tool at Pneu-Tools' booth and, (d) Pneu-Tools has since sold thousands of nail and staple guns throughout the U.S., Canada and Europe. (See, ¶¶ 1-9, Ex. R.) In fact, Mr. Bird testified he knew Mr. Southall because he had worked with him at Paslode, and he had met with him at the STAFDA show in 1999 or 2000. (p. 56-59 of Bird's 6/5/06 dep., Ex. S.)

Finally, the Affidavits of Jerry Koontz of Fasco America, Kuangcheng Cheng of T.C. International, Inc., and Shirley Cammarata of Black & Decker demonstrate the many orange nail and staple guns in the market before and since ITW's trademark application. (Ex. T, U, and V.) Accordingly it is abundantly clear that Mr. Southall and ITW knew of competing orange nail and staple guns when they responded to the PTO's Office Action, but failed to disclose this information. The Seventh Circuit contemplated that the registration process would include an *ex parte* search and examination by the PTO examiner. *Money Store v. Harriscorp Fin. Inc.,* 689 F.2d 666, 671 (7th Cir. 1982). PTO Office Actions are part of such a search and examination, and an applicant is obligated to truthfully answer whether there is other significant use of the mark – regardless of whether the applicant believes them to junior users – in response to PTO questioning. *Gaffrig Performance v. Livorsi Marine*, 2003 U.S. Dist. LEXIS 23018 at *44.

### C. ITW Knew Its Claimed Trademark Did Not Apply to Pneu-Fast's
### Prop Nail Gun

Before filing its lawsuit ITW knew its registered trademark for "the color orange as applied to the housing and grip of the nailers and staplers" did not cover Pneu-Fast's prop gun, which does not have orange on its housing or grip. (Ex. M and Ex. A of ITW's Motion.) Rather, the housing and grip of Pneu-Fast's prop are silver and black, and the gun's end cap is orange.

Lew Klein, who, along with ITW's attorneys was responsible for obtaining the trademark and therefore knew its intended coverage, testified that he brought Pneu-Fast's prop gun to the attention of his superiors because he thought it resembled ITW's Power Master Plus gun. (p. 37 of Klein dep., Ex. W.) Mr. Klein, however, testified that ITW's trademark is a "totally different tool" and is "not close" to covering ITW's Power Master Plus gun, and thus Pneu-Fast's prop.[2] (pp. 109, 113 of Klein dep., Ex. X, Ex. Y.) Similarly, ITW's tool schematics, which separately designate the "housing" and "cap" of ITW's nail guns demonstrate that ITW did not consider Pneu-Fast's prop gun, with its orange end cap and a silver housing, to be covered by its trademark. (Ex. Z and AA.)

The most compelling evidence of ITW's knowledge that its registered trademark did not cover Pneu-Fast's prop was a memorandum prepared by ITW Remodeling Segment Manager Kevin Walsh in December of 2005 or January of 2006,[3] [redacted] Ridgid nail guns, which have orange housings and grey end caps (the "Walsh Memo"). (Ex. CC and DD[redacted].) The Home Depot,

---

[2] Mr. Klein's testimony is consistent with *Trademark Man. Exam. Proc.* § 1202.05(d)(i), Drawing of Color Marks in Trademark Applications, which states that "[i]f the mark is used in multiple goods that are dissimilar or unrelated, *or if color is used in different ways on different goods*, so that a depiction of one of the goods is not a substantially exact representation of the mark as used on all of the goods . . . a separate application must be submitted for each item." (emphasis added). To effectively register a trademark for each variation of the use of orange on its nail guns, ITW needed to submit separate applications for each differing use. ITW's trademark registration does not cover Pneu-Fast's prop gun because it does not describe the color combination used on that tool.


[3] During his March 22, 2006 deposition Mr. Walsh testified that he had prepared the Memo three or four months earlier. (Ex. BB, pp. 222 - 224).

ITW's largest customer, launched its Ridgid nail guns in May of 2005, and is the reason ITW is now dismissing its lawsuit. (Ex. EE, p. 3 of ITW's Motion.) [Redacted.]

### IV. <u>ITW's Bad Faith, Dilatory and Vexatious Tactics During the Litigation</u>

ITW's bad faith, dilatory and vexatious tactics continued throughout the litigation.

### A. ITW Withheld Important Documents in Discovery

On November 30, 2005, ITW served Pneu-Fast with its Rule 26(a) disclosures ("Rule 26(a) Disclosures"), claiming to have produced "[d]ocuments … which ITW reasonably believes are relevant to disputed facts alleged with particularity in the pleadings [including] materials and information concerning third-party uses [of orange] on similar tools." On January 18, 2006, Pneu-Fast served ITW with its First Request for Production of Documents and Things (the "Document Requests"), which included requests for all documents evidencing ITW's knowledge of the use of orange in connection with nail guns by its competitors, or actual or likely confusion resulting from third party uses of orange. (¶¶ 6, 24 & 25, Ex. FF.) ITW served Pneu-Fast with its responses to the Document Requests on March 3, 2006, and March 20, 2006.

On March 3, 2006, Pneu-Fast issued Subpoenas to Ridge Tool Company, Pneu-Tools, Inc. and Spotnails, seeking information regarding those companies' use of orange on tools, products or packaging, and served copies on ITW's counsel. Likely cognizant that the Subpoenas would yield documents they should have produced in response to Rule 26(a) and the Document Requests, on March 9, 2006, ITW's counsel produced copies of correspondence between ITW's counsel and representatives of Emerson Electric Company (which licenses the "Ridgid" name through Ridge Tool Company), Ridge Tool Company, Pneu-Tools, Inc. and Black & Decker (the "Withheld Documents") (Ex. GG). The correspondence consisted of "cease and desist" letters from ITW's counsel to representatives of those companies alleging trademark violations due to their orange

tools, and responses to ITW's attorneys from attorneys for those companies, during the period between May 24, 2005 and January 11, 2006.

On March 13, 2006, Pneu-Fast's counsel wrote ITW's counsel warning them Pneu-Fast would seek sanctions if it determined ITW or its counsel had not produced other documents in response to its Document Requests. (Ex. HH.) On March 15, 2005, ITW's counsel produced February 27, 2006 correspondence they had received from a Black & Decker's attorney in response to their cease and desist letter, including a book of exhibits supporting Black & Decker's prior use of orange and proving why ITW's trademark was not valid. [4] (See the forgoing Withheld Documents, Ex. II, and exhibits to Ex. V.)

### B. ITW Withheld Documents Regarding Home Depot's Ridgid Nail Guns

During Bruce Jacob's March 16, 2006 deposition, Pneu-Fast's counsel learned ITW had withheld correspondence between ITW and The Home Depot regarding The Home Depot's use of orange on its Ridgid nail guns. (pp. 54-57 of Jacobs dep., Ex. JJ.) On March 20, 2006, ITW's counsel produced (1) an email and License Agreement that on February 24, 2006, Tom Southall sent to Bill Godwin, a Home Depot Vice President, with the intention of granting The Home Depot a free license to use orange on its Ridgid nail guns, and (2) March 13, 2006, correspondence from Robert B. Dulaney III, Home Depot's Senior Corporate Counsel for Intellectual Property, rejecting the License Agreement on the grounds that, *inter alia,* ITW's trademark does not cover Ridgid guns.

---

[4] On March 3, 2006, when ITW's counsel responded to Pneu-Fast's Document Requests they were well aware of the Withheld Documents because they had sent or received them only months, and in the case of Black & Decker's response, only days before answering the discovery. In fact, when ITW's counsel answered the discovery they **were even thinking about** Ridgid, Pneu-Tools, Inc. and Black & Decker, because they identified those companies as competitors who use the color orange in their answer to Pneu-Fast's Interrogatory Number 16.
.

(Ex. KK.)  And during Kevin Walsh's March 22, 2006 deposition, Pneu-Fast's counsel learned ITW had also withheld the Walsh Memo.  (pp. 227-28 of Walsh dep. Ex. LL.)[5]

### C.  The Importance of the Withheld Documents

The withheld "cease and desist" correspondence demonstrated ITW's pattern of threatening competitors with trademark infringement claims, but then doing nothing to enforce its purported trademark rights.  This evidence was important because the failure to police a trademark by suing infringers can lead to the abandonment of the trademark or cause the trademark to lose its significance as an indication of origin.  15 U.S.C. § 1127(b).  See also *Frank G. Liberto v. D. F. Stauffer Biscuit Co. Inc.,* 441 F. 3d. 318 n. 11 (5th Cir. 2006), and *Sweetheart Plastics Inc. v. Detroit Forming Inc.,* 743 F.2d 1039, 1047 (4th Cir. 1984).  And the competitors responses were significant because they demonstrated ITW's claimed trademark was invalid.  For example, Black & Decker responded with proof of over 80 years of its prior use of the color orange, a litany of reasons ITW's trademark is invalid, and a threat to cancel ITW's trademark because it violates Black & Decker's trademark.  (Ex. II, Ex. V.)

The withheld documents regarding Home Depot's orange Ridgid nail guns were also critically important.  The proposed *free* license to sell orange Ridgid pneumatic nail guns, while prohibiting Home Depot from using orange on gas-powered guns, demonstrates that ITW really only intended for its trademark protection to apply to its gas-powered nail guns as opposed to pneumatic guns such as Pneu-Fast's prop.  And Home Depot's response that ITW's trademark

---

[5] At the time ITW's counsel responded to Pneu-Fast's Document Requests they were well aware of the February 24, 2006 License Agreement and likely the March 13, 2006 rejection of the License Agreement by Home Depot. According to Mr. Southall's email to Mr. Godwin, which transmitted the License Agreement, and the deposition testimony of ITW's witnesses Mark Boutelle and Mr. Southall, ITW's attorneys drafted the License Agreement. And when ITW's counsel responded to Pneu-Fast's Document Requests ITW, and quite possibly ITW's counsel, were aware of Mr. Walsh's memorandum detailing Plaintiff's options regarding the Home Depot/Ridgid situation, because he had prepared it within only a month or so of Pneu-Fast's January 18, 2006, Document Requests. Plaintiff and its attorneys, however, concealed each of these documents and disclosed them only after the "cat was out of the bag" and they risked being sanctioned for discovery abuse.

applies to a very specific pattern of orange as applied to the single model gas-powered nailer depicted in the registration demonstrates this is precisely how Home Depot interpreted ITW's trademark.

The most important Withheld Document, however, was the Walsh Memo, which contradicted his testimony and the testimony of other ITW witnesses that (a) there is no difference between a nail gun's "housing" and its "end cap", and (b) Pneu-Fast's prop gun, which has an orange trigger and end cap, violates ITW's trademark. (pp. 50-66 of Walsh dep., Ex. MM.)

### D. ITW and its Counsel Engaged in Bad Faith, Dilatory and Vexatious Tactics by Violating Rules 26(g) and 37(c) When They Falsely Certified Discovery Responses and Submitted Evasive and Incomplete Discovery Disclosures

ITW and its counsel had a duty to conduct a reasonable inquiry when responding to the Document Requests. Fed. Rules Civ. Proc. 26(g). However, they violated Rule 26(g) of the Federal Rules of Civil Procedure by falsely certifying the responses to the Document Requests were complete after a reasonable inquiry and not submitted to cause delay, increased cost or undue burden. ITW and its counsel clearly engaged in an abuse of process because although they had recently prepared or received each of the Withheld Documents they waited to disclose them until Pneu-Fast's counsel was about to obtain them from other sources, or had unearthed their existence during depositions, rather than voluntarily producing them pursuant to ITW's Rule 26(a) Disclosures or the Document Requests. Federal Rule 37(c) provides that a party without substantial justification that fails to disclose information required under Rule 26 is subject to sanctions that may include reasonable attorneys' fees.

### V. Exceptional Case Solely Due to the Weakness of ITW's Claims

As the 7th Circuit held in *Door Systems, Inc.* "…a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value."

In this case there can be little doubt that ITW had improper motives when it filed this lawsuit. However, even if it could be said that ITW was not acting in bad faith and honestly though mistakenly believed it had a good case, ITW's suit was oppressive because it was wholly lacking in merit.

### A.  ITW Had No Proof of Likelihood of Confusion

Proof of likelihood of confusion is a necessary element of a claim under the Lanham Act. *Bretford Manufacturing. v. Smith System Manufacturing*, 389 F. Supp at 986.  A trademark is simply "an identifier of source.  Others can use the same mark to identify their product, provided there is no likelihood of confusion which would impair the trademark's function as an identifier."  Sears v. Menard, *2003 U.S. Dist. LEXIS 22246* at *15-16, quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 83 F.3d 169, 173 (7th Cir. 1996).  Despite the allegations in its Complaint, ITW never conducted any pre or post-lawsuit research regarding likelihood of confusion and never had one iota of proof of likelihood of confusion.  For example in response to interrogatory 19, which asked if ITW had received inquiries or communications indicating confusion as to whether ITW or Pneu-Fast were somehow related and whether ITW was aware of any incidents of actual confusion, ITW stated "None". (Ex. NN.)

Similarly, ITW did not produce a single document in support of its likelihood of confusion claim pursuant to its Rule 26(a) Disclosures or in response to Document Requests.  That there was no likelihood of confusion was confirmed by each ITW witnesses who was deposed regarding the matter.  Tom Southall testified that (a) since the interrogatory, or at any time, he knew of no cases of confusion, (b) he was not aware of even one instance where anyone had been confused as to whether an orange nail gun not made or sold by Paslode was a Paslode gun, (c) ITW had not made any effort to track any such instances of confusion, and (d) he was not aware of any consumer surveys by ITW or others to determine whether any such confusion existed in the marketplace.  (pp.

50-53 of Southall dep., Ex. OO.)  Mark Boutelle, who answered the interrogatories, testified that

there had been no cases of confusion right up to the time of his deposition.  (pp.49-50 of Boutelle

dep., Ex.PP.)  Bruce Jacobs testified that he (a) was unaware of any inquiries or communications

from consumers indicating confusion, and (b) did not know if ITW had ever received inquiries or

communications from customers, distributors, retailers, or anyone else indicating confusions as to

whether Pneu-Fast was somehow connected or related to ITW. (pp. 27, 145 of Jacobs dep., Ex.

QQ.)  Lew Klein testified he (a) was not aware of any inquiries or communications ITW had

received from consumers, distributors, retailers, or anyone indicating confusion between Pneu-Fast

products and ITW's products, and (b) was not aware if anybody at ITW had ever received any

inquiries as to whether Pneu-Fast sells an ITW nail gun, whether ITW sells Pneu-Fast products or

guns or whether ITW makes a nail gun or other products for Pneu-Fast. (pp. 142-143 of Klein dep.,

Ex. RR.)  Kevin Walsh testified that nobody had ever contacted ITW and said they were confused as

to whether the gun depicted in the Pneu-Fast ads or web site was a gun made by ITW.  (p. 194 of

Walsh dep., Ex. SS.)   Chris Mettler, a Paslode product manager, testified he had never heard any

allegations or any complaints or concerns from customers or anybody at ITW that there was

confusion as to whether any Pneu-Fast products, whether they were nails or nail guns, were

somehow confused by the end users with Paslode products.[6]  (p. 67 of Mettler's 6/8/06 dep., Ex.

TT.)  And Ivan Ross, ITW's expert witness, testified that (a)  "if it were a false advertising case

[which it of course was] the standard procedure would be to" conduct a survey to test for likelihood

of confusion -- "a perception test in the real world" -- but (b) he did not follow this procedure in

this case.  (pp. 145-147, 151-152 of Ross' 7/19/06 dep., Ex. UU.)

    Although ITW will likely attempt to rely on Ross' after the fact Supplemental Statement to

argue it had evidence of likelihood of confusion, the Statement is not admissible under Rule 702 of

---

[6] The Rap-A-Nail nail gun referred to by Mr. Mettler is sold by Pneutools, a company that has nothing to do with
Pneu-Fast.

the Federal Rules of Evidence (See, Pneu-Fast's Motion to Strike Ross' Statement and Supplemental Statement, Ex. VV.)  And even if the Supplemental Statement were admissible it would not constitute such evidence because Ross does not therein render an opinion regarding the likelihood of confusion between ITW and Pneu-Fast.

## VI.  Conclusion

This case is remarkably similar to *Sears v. Menard*, 2003 U.S. Dist. LEXIS 22246, in which like ITW, Sears voluntarily dismissed its trademark lawsuit with prejudice under *Fed. R. Civ. P. 41(a)(2)*, claiming it had "recently adopted a new corporate marketing campaign theme which does not use [its purported trademarked slogan]", and that therefore there was no point in continuing with the case. *8.  Judge Grady granted costs and fees for Menards, finding Sears lawsuit to be oppressive based primarily on lack of merit.  In fact, this Court could practically adopt the heart of the decision, substituting "ITW" for "Sears":  "[i]t is not credible that, if [ITW] really thought it had acquired secondary meaning [in its claimed orange trademark] it would simply abandon the marks and dismiss the lawsuit with prejudice." *15.  "[ITW] is in the best position to know whether the public had come to associate [its claimed orange trademark] with [ITW], and its conduct speaks far louder than the arguments in its briefs." *15.  "We think a far more glaring defect in [ITW's] case is the absence of any evidence of the likelihood of confusion.  Even if [ITW] did have a valid mark, that would avail it nothing unless [Pneu-Fast] infringed on the mark, and that requires a likelihood of confusion." *15.  The best evidence [ITW] has of confusion is the [Ross Supplemental Statement], and it is no evidence at all.  It is so flawed, in so many ways, that we conclude it is clearly inadmissible under Daubert." *16   "[ITW] would have to prove likelihood of confusion at trial. There is no possibility it could have succeeded."  *20.  "The question, again, is whether, as an objective matter, there was ever any merit to [ITW's] allegation that there was a likelihood of confusion, and we hold that there was not."  *20.

For nearly the last three years ITW has been oppressing Pneu-Fast with unfounded and unsubstantiated claims under the Lanham Act and litigation maneuvers and tactics which violate Rule 11 and 28 U.S.C. §1927. ITW has finally seen the writing on the wall and has moved to dismiss its own lawsuit with prejudice. Although the dismissal should end ITW's campaign of abuse, it will not begin to remediate the financial harm ITW has caused Pneu-Fast. Pursuant to §1117(a) of the Lanham Act this Court has the ability to assist in righting ITW's wrongs. Pneu-Fast respectfully requests that the Court do so, by entering an Order assessing Pneu-Fast's fees and expenses incurred in this litigation against ITW.

Respectfully submitted,

CHESTER BROTHERS MACHINED PRODUCTS, INC.

/s Joseph S. Messer

_____
By One of Its Attorneys

Messer & Stilp, Ltd.
Joseph S. Messer #6200036
166 West Washington, Suite 300
Chicago, IL 60610
Ph: (312) 334-3476
Fax: (312) 334-3434